[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Plaintiff Dominick Moschini d/b/a Heritage Construction ("Moschini") has brought this action against defendants Bristol Crane Service, Inc. ("Bristol Inc.") and Theodore Zachary ("Zachary") by complaint dated April 8, 1998.
In the first count he alleges that on or about October 19, 1992 Bristol, Inc. and Moschini formed a partnership by oral agreement, wherein they agreed that the partnership would perform construction and demolition services and share equally in the profits derived therefrom. He further alleges that on November 10, 1997 the partnership was dissolved by unilateral decision of Bristol, Inc. He claims that the partnership owns assets but that defendant Bristol, Inc. refuses to dissolve the partnership and to settle Moschini's partnership claims.
In the second count Moschini alleges that he and defendant Zachary formed the partnership and that the parties cannot agree as to the disposition of the partnership effects and the settlement of the affairs of the partnership. He alleges that Zachary refuses to attend to the dissolution of the partnership.
In the third count he alleges that Zachary, as the sole shareholder of Bristol, Inc. induced him to perform services for Bristol, Inc. by representing to and promising Moschini that he would acquire Bristol, Inc. in return for his services, that Moschini performed considerable services for Bristol, Inc. without compensation in reliance on such representations, that Zachary refuses to convey to Moschini shares of Bristol, Inc. and that Moschini has suffered damages. CT Page 15371
In the fourth count the plaintiff alleges unjust enrichment on the part of Zachary (sole shareholder of Bristol, Inc.)
In the fifth, sixth and seventh counts plaintiff alleges that Zachary and/or Bristol, Inc. fraudulently induced him to perform services to his detriment and damage.
In the eighth and ninth counts he alleges a violation of the Connecticut Unfair Trade Practices Act.
Plaintiff seeks damages, punitive damages, an accounting, an appointment of a receiver, imposition of a constructive trust, attorneys fees, and costs.
Defendants have denied these allegations and by way of special defense allege that the action is barred by the expiration of the statute of limitations. Also by way of counterclaim they allege a claim for rent of a portion of commercial property located at 55 Canal Street, Plainville, Connecticut. Plaintiff has denied the special defense and counterclaim.
A trial to the court was held on May 18, 19, 20, 26, 27, June 1, 2, 3.
The court finds the following facts. In the years 1984 through 1991 the plaintiff was in the excavation trade. Also he did small jobs for defendant Zachary as an independent contractor. During those years Zachary was in a partnership with his cousin doing demolition work. In 1991 Zachary bought out his cousin. Thus Moschini began to get more involved in working with Zachary in Zachary's demolition work. Business was slow at first because Zachary's equipment was 20 years old.
In 1992 Moschini and Zachary met on a daily basis and sought more and more customers who needed demolition work. In the latter part of 1992 Zachary had only one employee, but no field employees. Thus, Moschini arranged to have his own employee, Ron Bonenfont work with Zachary and himself on the demolition work. Moschini would bring Bonenfont and equipment to the job sites and Zachary brought his own equipment and himself but no other employees.
Beginning in late 1992 Moschini and Zachary worked together as a team on virtually all of the Bristol Crane jobs. However, CT Page 15372 they had a very flexible payment arrangement between them. Moschini would bill Bristol Crane for time spent on Bristol's jobs by Ron Bonenfont. He did not, however, bill for his own time, nor did he keep records of his own time. Occasionally, he asked for money as he needed it, and Zachary would give him what he asked for.
Almost immediately after forming their association in 1992 Moschini and Zachary began to look for an excavator. After shopping together for new and used excavators, they purchased a used Linkbelt Excavator in 1993 through one of Moschini's friends for approximately $43,000. Zachary financed the purchase of the Linkbelt in the name of Theodore Zachary d/b/a Bristol Crane Services and depreciated the equipment through the business. All payments for the Linkbelt, including the down payment, came out of the company checking account.
The Linkbelt was not appropriately equipped for demolition when Zachary and Moschini first obtained it, and Moschini designed and built a thumb or grapple for the machine rather than incur the expense of purchasing a commercially-made thumb. When Zachary and Moschini purchased the Linkbelt, only Moschini was capable of operating it, and it quickly became the primary tool used by Bristol Crane for demolition work. Zachary was unable to operate the Linkbelt for several years, but Moschini finally taught him how to use it.
Shortly after the purchase of the Linkbelt, Zachary and Moschini began to look for a new truck to haul their equipment. Moschini provided the specifications for the truck and both Moschini and Zachary shopped for the truck, first looking for used equipment and then later deciding on a new truck. Zachary and Moschini were first concerned about the price of a new truck and later about the availability of an acceptable used truck. When they decided to purchase the new truck, Moschini was concerned about its price and their ability to make the loan payments.
Moschini ultimately found the truck that they purchased through a dealer in Boston, and Moschini negotiated for and ordered the truck from the Boston dealer. Zachary was not licensed to operate the new truck. Zachary financed the truck in the name of Theodore Zachary d/b/a Bristol Crane Service and all of the payments for the truck, including the down payment, came from the business account. CT Page 15373
Subsequently, Moschini and Zachary acquired a new trailer to haul the Linkbelt behind the Kenworth. Moschini and Zachary agreed as to the size of the trailer needed and Moschini negotiated for and ordered the trailer through his friend's dealership. Zachary again financed the trailer in the name of Theodore Zachary d/b/a Bristol Crane Service and all of the payments for the trailer, including the down payment, came from the business account.
Moschini and Bonenfont (Moschini's employee) performed the maintenance on the equipment. Moschini took steps to protect the equipment on job sites, sometimes hiring people to watch over the equipment at night.
Moschini considered himself accountable for payment of the loans for the Linkbelt, the trailer, and the Kenworth by way of ensuring that the loans were paid first from company cash flow. Zachary also attended to payment of the equipment loans and other business obligations before disbursements were made to Moschini. Moschini stated at trial that he would have completed payment of those loans had Mr. Zachary died during the term of their association.
All of the equipment is owned free and clear of liens. The Kenworth was recently the victim of a catastrophic loss and was appraised in connection with insurance coverage at $56,000. Zachary accepted settlement of the insurance claim at that price. Moschini received nothing. The Rogers trailer was appraised at $31,000 and the Linkbelt was appraised at $45,000.
Zachary consistently and repeatedly complained about the lack of available cash in the business and spoke often of having to make payments on business obligations and the equipment loans. Thus, Moschini often directed Zachary to make payments on the loans and other obligations rather than making payments to Moschini. Moschini was willing to forego payments because he believed he was building sweat equity in the business.
Moschini, Bonenfont and Peter Zagres each testified about Zachary's repeated statements that he was about to retire and that Moschini would take over the business after Zachary's retirement. Moschini testified that Zachary repeatedly told him that he was "getting out" of the business and that he would retire "in another year" or, at various other times. Bonenfont CT Page 15374 further testified about Zachary's repeated and regular refrain that he was getting out of the business. Moschini and Bonenfont both testified about Moschini's meeting with Zachary at the beginning of January 1997 wherein Zachary committed to retire in two years. Moschini and Bonenfont both testified that Moschini had expectations, based on numerous conversations with Zachary, that he would be taking over the business after Zachary's retirement. Peter Zagres further testified about conversations in 1994 between Zachary and Moschini, in Peter's presence, wherein Zachary again said that he would be retiring and that Moschini would take over the business after his retirement.
Zachary, on the other hand, testified that he (1) does not presently have a retirement plan, (2) never had a retirement plan, (3) would continue to work as long as he could and (4) has already emptied his retirement account. The court believed the testimony of Moschini, Bonenfont and Zagres in regard to Moschini's claim that Zachary told Moschini and others that he planned to retire and that Moschini would then be able to take over the business. Moschini claims that Zachary's promise and representation about Moschini's future with the business caused Moschini to continue to perform services for the business without payment and to often urge Zachary to apply funds otherwise payable to Moschini to payment of creditors. Moschini was first concerned about paying off the equipment loans and funding the cash requirements of the business. Moschini relied on Zachary's representations in continuing his association with Zachary. Moschini accepted Zachary's representations as true and made plans in reliance on those representations. If Moschini had no expectations about running the business, he would not have been concerned about the payment of the business loans, which payments were often made to his detriment.
When Zachary and Bristol Crane satisfied their obligations to other creditors in connection with equipment loans, Zachary kept the equipment, ceased making representations about Moschini's future with the business, and terminated his arrangement with Moschini.
At issue under counts 1 and 2 of the complaint is whether the plaintiff has shown that he is entitled to prevail under his claim that he has established a partnership agreement. It would appear that plaintiff and defendant Zachary (individually or as sole shareholder of defendant Bristol, Inc.) acted as though they had formed some sort of a partnership. Clearly, Moschini worked CT Page 15375 on virtually all of the Bristol Crane jobs, even when Zachary did not. Zachary was out of the state during much of 1995. Yet Moschini continued to work on Bristol Crane jobs, and he made many decisions in regard to those jobs. He was not an employee of Zachary. Nor was he an independent contractor (except where an independent contractor had to be named on jobs requiring payment of prevailing wages).
The question, then, is whether the plaintiff can prevail on Counts 1 and 2 of the complaint. According to General Statutes §34-301(5), "Partnership means an association of two or more persons to carry on as co-owners of a business for profit . . ." General Statutes § 34-301(6) provides: "Partnership agreement means the agreement, whether written, oral or implied, among the partners concerning the partnership . . ." Although the parties acted as though they were partners, the court finds that the plaintiff has not been able to demonstrate what the terms of their partnership agreement were in the event the partnership should be dissolved. He could only testify that Zachary told him several times that he, Zachary, was looking to retire and that when he retired Moschini would take over the business.
On cross examination Moschini testified that in 1997 Zachary told him he was "looking at two years in which he would retire. Yet when asked what was going to happen when Zachary retired he stated "we would have sat down and talked about it then." When questioned "well, what would you have wanted from him in two years?" he replied "I don't know what I wanted." Thus, the court does not believe the plaintiff can prevail on counts 1 and 2 of the complaint; for he has failed to show what the terms of the partnership agreement would have been in the event Zachary should retire. It appears that had Zachary retired, they would then have sat down and negotiated the terms of the "partnership" dissolution.
Nor can Moschini prevail under Count 3 of the complaint wherein he claims that Zachary induced him to perform services for Bristol, Inc. by promising that Moschini would acquire Bristol, Inc. in return for his services. Here again, the plaintiff has failed to show exactly what the terms of the inducement were. To be sure, he proved that Zachary promised that when he would retire, Moschini would own and run the business. However, he was unable to prove what the terms of his ownership would be. Would he be receiving all of the assets of the corporation, or only a percentage of them? In the third count he CT Page 15376 is asking that Zachary convey to him shares of Bristol, Inc., but it is not clear from his testimony whether he wants some or all of those shares.
Nor does the court find that the plaintiff can prevail under the fifth, sixth and seventh counts of the complaint wherein he claims fraudulent inducement to perform services to his detriment and damage. The essential elements of an action in fraud are as follows: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. Kilduff and Adams, Inc., 219 Conn. 314, 329 (1991). Here again the court finds it difficult to determine what the damages would be. The plaintiff has failed to prove what Zachary actually promised him if he would continue to work. Was he to be given all the assets by Bristol, Inc. or only a percentage of the assets upon Zachary's retirement? All he has been able to show is that Zachary said he could take over the business when he retired. He has not been able to show under what terms Moschini would be able to take over the business.
As to count 4, however, the court finds that the plaintiff should prevail under the theory of unjust enrichment. Clearly, Zachary and Bristol, Inc. have been unjustly enriched to Moschini's detriment and damage. As stated in Polverari v. Pratt,29 Conn. App. 191 (1992) at pages 200-201:
 "The right of recovery for unjust enrichment is equitable, `its basis being that in a given situation it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff.' Schleicher v. Schleicher, 120 Conn. 528, 534, 182, A.2d 162 (1935)." National CSS, Inc. v. Stamford, 195 Conn. 587, 597, 489 A.2d 1034 (1985). Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. Cecio Bros., Inc. v. Greenwich, 156 Conn. 561, 564, 244, A.2d 404 (1968). Plaintiffs seeking recovery for unjust enrichment must prove "(1) that the defendants were benefitted [benefited], (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Bolmer v. Kocet, 6 Conn. App. 595, 612-13, 507 A.2d 129 (1986).
The facts showed that beginning in 1992 Moschini became CT Page 15377 increasingly involved in the operations of the business. He acquired authority to price work in Zachary's or Bristol, Inc.'s name, accept and reject work in their name, schedule work completed in their name, negotiate agreements in their name, accept payments on their behalf, and commit them to make payments. Moschini maintained an office at Bristol's offices; Moschini had full access to Bristol work records, customers and vendors; Moschini was supplied with Bristol Crane business cards and truck signs; Moschini carried a Bristol Crane beeper; Moschini was involved in every demolition project completed by Bristol, Inc. and or Zachary during and after 1992. Most importantly, Moschini did not get paid for much of his work. Bristol, Inc. was incorporated in 1994 with Zachary as the sole shareholder. The fact that the business was incorporated did not change the manner in which Moschini and Zachary continued to work together.
The court finds that Moschini has proved (1) that Zachary individually and as sole shareholder of Bristol, Inc. has benefitted [benefited] from Moschini's work, (2) that the defendants unjustly did not pay Moschini for most of those benefits (and in fact terminated his relationship when the company's business became lucrative) and (3) that the failure of payment was to Moschini's detriment. The court therefore has determined that Moschini is entitled to damages.
It is true that Moschini failed to keep records of his time in regard to all the jobs on which he performed. It is apparent, however, that he did so because he reasonably believed that he was putting "sweat equity" into the business and that he would eventually have an interest in running the company. Clearly, Zachary took advantage of Moschini's naivety and led him to believe such to be the case. Thus, while the court cannot determine Moschini's damages with complete specificity based solely on his own records, the court has looked to other evidence to determine, at least in part, some of his damages. The court, finds his damages to be as follows:
 First: He is entitled to 1/2 the insurance proceeds in the amount of $56,000 received by Zachary and/or Bristol, Inc. when the Kenworth was destroyed. Moschini had forgone payments to himself during the period when the loans for the purchase of the Kenworth were paid off. $28,000 CT Page 15378
 Second: He is entitled to 1/2 the appraised value of The Linkbelt. He had forgone payments to himself during the period when the loans for its purchase were paid off. $22,500
 Third: He is entitled to 1/2 the appraised value of the Rogers trailer. He had forgone payments to himself during the period when the loans for its purchase were paid off. $15,500
 Fourth: Although Moschini received some payments for his extensive work as project manager on the Bridgeport prison job, the payments were extremely modest considering all the work he did. Exhibit K. indicates that the parties had entered a contract wherein Moschini would be paid $47,000 as a subcontractor on the Bridgeport job. However, there was no evidence that any part of that $47,000 was paid. The court finds that the sum of $47,000 should be added to the payments already made for Moschini's work on the Bridgeport job. $47,000
 Fifth: Moschini is entitled to the sum of $9,920 for work that he performed on the Mansfield Training Center job. That contract was for $20,000. Yet the evidence showed that he was only paid $10,080 as part payment (in addition to $3,840 for labor). $ 9,920
 Sixth: In 1997 the plaintiff began to complain that Zachary owed him money (according to testimony of Richard J. Minella, the accountant for both parties). Defendant agreed that he owed him money although there was no agreement on the amount. However, Zachary said he would pay him $2,000 a week for 22 weeks, or $44,000. However, he only paid him $30,000.
The court finds he still owes him $14,000. $14,000
Total Damages $136,920.00
In summary, the court finds that the plaintiff is entitled to damages in the amount of at least $136,920.00. Clearly, he has proved unjust enrichment on the part of Zachary and/or Bristol, CT Page 15379 Inc. in that amount.
The court finds that the plaintiff cannot prevail on his CUTPA claim set forth in Counts 8 and 9. Counts 8 and 9 incorporate the sixth and seventh counts under which the plaintiff cannot prevail.
The defendants by way of counterclaim allege that the plaintiff and defendant(s) entered into an agreement for the plaintiff's use and occupancy of a portion of certain property located at 55 South Canal Street, in Plainville, Connecticut. The court finds that no such agreement was ever made. Thus, the defendants cannot prevail on this claim.
Accordingly, judgment may enter for the plaintiff in the amount of $136,920.00 on his complaint, plus interest at the rate of 12% from May 5, 1998, pursuant to his offer of judgment dated May 3, 1999, plus an attorney's fee in the amount of $350. (General Statutes § 52-192a(b). Judgment may enter for the plaintiff on defendant's counterclaim.
Frances Allen Judge Trial Referee